Matthew D. Powers (CA Bar No. 104795)
matthew.powers@tensegritylawgroup.com
Paul T. Ehrlich (CA Bar No. 228543)
paul.ehrlich@tensegritylawgroup.com
William P. Nelson (CA Bar No. 196091)
william.nelson@tensegritylawgroup.com
Natasha M. Saputo (CA Bar No. 291151)
natasha.saputo@tensegritylawgroup.com
Jerome Ma (CA Bar No. 335129)
jerome.ma@tensegritylawgroup.com
TENSEGRITY LAW GROUP LLP
555 Twin Dolphin Drive
Suite 650
Redwood Shores, CA 94065
Tel: (650) 802-6000
Fax: (650) 802-6001

Azra M. Hadzimehmedovic (CA Bar No.
239088)
azra@tensegritylawgroup.com
TENSEGRITY LAW GROUP LLP
8260 Greensboro Dr.
Suite 260
McLean, VA 22102-3848
Tel: (650) 802-6000
Fax: (650) 802-6001

*Attorneys for Plaintiff DivX, LLC*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| DIVX, LLC,<br><br>         Plaintiff,<br><br>    v.<br><br>VIZIO, INC.,<br><br>         Defendant. | Case No. 8:22-CV-01995<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff DivX, LLC ("Plaintiff" or "DivX") alleges in its Complaint for patent infringement against Defendant VIZIO, Inc. ("Defendant" or "VIZIO") as follows:

## I.  NATURE OF THE ACTION

1.  This is an action for infringement of U.S. Patent Nos. 7,295,673 ("the 673 Patent"); 10,225,588 ("the 588 Patent"); 11,102,553 ("the 553 Patent"); and 11,050,808 ("the 808 Patent") (collectively, "the Asserted Patents").

## II.  INTRODUCTION

2.  Plaintiff DivX, LLC ("Plaintiff" or "DivX") is a U.S. company founded in 2000.

3.  Since its inception, DivX has set the bar for high-quality digital video. DivX is one of the first companies to enable successful delivery of high-quality digital video over the internet. For more than 20 years, DivX has been developing innovative technologies to deliver better digital entertainment experiences for consumers—making internet video high-quality, secure, easy, and enjoyable for consumers to watch on any device.

4.  Continuing to this day, DivX's patented technology helps people around the world enjoy digital media on their own terms. Today, consumers take for granted that high-quality video from the internet is readily available on any device at the touch of a button. But by the time DivX's engineers accomplished this feat in the mid to late aughts, they had to overcome significant technical obstacles to do so. Through those efforts, DivX engineers invented foundational technologies that made high-quality internet video possible long before smart televisions existed.

5.  For example, DivX's fundamental advances in video compression and streaming technology have made it possible to transmit large video files efficiently over the internet. DivX also created technology that allows those video files to be streamed to and played on a wide variety of consumer electronics devices. DivX further developed encryption technology (*e.g.*, Digital Rights Management technology) for video files, to protect valuable video content so that content producers would be comfortable making

their original works available on the internet. DivX's fundamental advances include innovations in multiphase adaptive bitrate streaming, playback of encrypted bitstreams, and enabling seeking functionality during streaming playback. DivX's innovation paved the way and provided a roadmap for today's proliferation of internet video streaming on consumer devices.

6.     Digital Rights Management ("DRM"), is the foundation of many DivX innovations. A robust DRM system allows owners of video content (like movie studios) to control access to the video content and provide increased protection against piracy. DRM is therefore fundamental to distribution of video over the Internet because DRM enables secure downloading and playback of videos.

7.     In 2001, when DivX took the first steps toward creating an Internet video platform, content owners such as Hollywood studios would not release their premium video content on an Internet platform because they feared that piracy and losing control of their content would severely diminish the value of their rights.

8.     From 2000 to 2005, DivX met with content owners such as Disney, Warner Bros., Sony, and Paramount Pictures about technical solutions to overcome their concerns and to implement the strict security requirements that the owners demanded. During the same period, DivX also met with major consumer electronics manufacturers about overcoming challenges to implementing DRM features in their devices. DivX recognized at the time that existing technologies would not meet the content protection concerns of studios, and it had to innovate to serve the market need.

9.     DivX engineers worked to build a DRM system that would solve these long-standing technical problems, and as a result of DivX's research and development efforts, DivX DRM became one of the first DRM systems accepted by major Hollywood Studios.

10.     In 2001, DivX completed a new implementation of the MPEG_4 video standard that aimed to satisfy consumer demand for accessible, high-quality digital video content—DivX Codec 4.0. Over the next decade, DivX developed and released

COMPLAINT

numerous new and improved versions of the DivX Codec. DivX bundled the DivX Codec with other features for video encoding, decoding, and playback and packaged it as the "DivX Software."

11. In addition to providing the DivX Codec, the DivX Software functioned like a master translator for video files, allowing variations in codecs, containers, and playback across different file types in different devices. It allowed consumers to compress, decode, and play back digital video using a single program that could allow users to access and use the variety of technologies available on the market, all in one place.

12. DivX continually evolved and improved its DivX Codec and DivX Software and consumer access to and use of digital video over the Internet became more widespread as computing power and network bandwidth increased. These developments led to widespread adoption of the DivX Software, a large base of DivX users, and the creation of billions of DivX video files.

13. In 2001, DivX launched Open Video System ("OVS")—an Internet-based video-on-demand system that built upon the quality and performance of DivX Software. OVS launched at a time when broadband Internet access was not yet ubiquitous and in a business environment where Hollywood studios were not yet ready to embrace digital distribution. After the launch of OVS, DivX engineers continued to invest in technical improvements and innovations for the platform, and their innovations expanded the platform to enable playback on a wide variety of playback devices.

14. DivX's investments in OVS produced many key innovations for delivering video over the Internet including:

A. A flexible, key-based DRM system that tied purchased video content to a viewer rather than a device, preventing unauthorized access when the device was sold or obtained by others while improving the viewer experience.

COMPLAINT

B.   A core codec that offered industry-best compression and performance, enabling full-screen, DVD-like quality that was vastly superior to the pixelated, postage-stamp size viewing experience associated with Internet video at the time.

C.   A "progressive download" feature that allowed the viewer to begin watching a purchased or rented video after only a few minutes while the file continued to download in the background.

15.   DivX OVS was a successful video streaming platform. Throughout the mid-2000s, hundreds of millions of devices spanning virtually every major consumer electronics manufacturer were released supporting DivX OVS playback. Blockbuster, Netflix, Amazon, and others discussed with DivX using DivX technology to power their streaming platforms.

16.   In 2006, DivX launched "Stage6"—one of the first HTTP-based websites for sharing and streaming high-resolution video. Streaming video from an HTTP-based website allows a web server to continuously send data to a viewer over a single HTTP connection that remains open. DivX Stage6 implemented DivX's video compression, codec, and playback technology in an HTTP-based environment that allowed users to upload, share, and view larger video files than other competing platforms at that time, like YouTube.

17.   DivX Stage6 was one of the earliest websites that supported sharing and streaming of high-resolution video. Even in 2007, when computing resources and network bandwidth were far more limited than today, DivX Stage6 supported streaming of 720p and 1080p high-definition video. The quality of the high-resolution video playback on Stage6 surprised reviewers, with one commenting "DivX has clearly got something right with web playback of higher-resolution video!" *See* HEXUS, "Review: DivX Stage6 (beta) – the high def rival to YouTube" (May 1, 2007), *available at* https://hexus.net/tech/reviews/software/8558-divx-stage6-beta-high-def-rival-youtube/. DivX Stage6 enjoyed rapid user traffic growth, and by January 2008, it had over

COMPLAINT

10,000,000 monthly views.

18.    In 2011, DivX released the DivX Plus Streaming SDK, an end-to-end Internet video streaming software that rivaled Blu-ray DVDs in quality and feature-set (such as user commands for seeking in the video, fast-forward, and rewind). The DivX innovations incorporated in DivX Plus Streaming include several that provide the foundation for the widespread technological success of video streaming today.

19.    DivX Plus Streaming was one of the earliest secure streaming software packages that supported Dynamic Adaptive Streaming over HTTP ("DASH"). DASH standardizes certain aspects of adaptive bitrate streaming of video over the Internet and has been widely adopted as a protocol used by many of today's video streaming services. Fast start and smooth switching among video streams of different resolutions, depending on bandwidth, both improve the viewer experience during DASH.  The innovations incorporated in DivX Plus Streaming improve both aspects of the streaming user experience.

20.    DivX engineers' efforts to create DivX Plus Streaming produced many innovations fundamental to today's video streaming services, including adaptive bitrate streaming that delivered video streams configured for each specific screen size on which the user wanted to watch the video. Configuring video streams based on the characteristics of individual playback devices ensures the optimal balance of video quality and playback performance.

21.    DivX continues to make investments in research and development for Internet video led to technical innovations. And DivX continues to patent its inventions. Today, DivX has a portfolio of more than 500 issued and pending patents and patent applications—with more than 400 issued patents alone.  Most recently, DivX has filed patent applications for its new Grove App which is available for download in the Apple App Store in the U.S. and Canada with an Android version coming soon.  See, for example, www.divx.com/grove.

22.    Presently, DivX has two distinct areas of business: (i) distributing

COMPLAINT

consumer software (*e.g.,* the DivX Software) implementing its technologies, and (ii) licensing its software and/or patents to consumer electronics manufacturers, video streaming platforms, and supply chain manufacturers. Consumers have downloaded DivX software more than one billion times and created billions of files using DivX's proprietary ".divx" file format. Consumer electronics companies as well as video streaming companies, including Samsung, Disney, and Element TV Company, have licensed DivX's technologies, and are able to integrate them into millions of devices worldwide. To date, DivX has licensed at least 50% of the global Smart Television market and at least 70% of the U.S. Smart Television market.

## III. THE PARTIES

23. DivX is a Delaware limited liability company. Its principal place of business is 4350 La Jolla Village Drive, Suite 950, San Diego, California, 92122. DivX owns patents covering foundational Internet video streaming technologies, including those asserted in this Action.

24. DivX holds all substantial rights and interest in the Asserted Patents, including the exclusive right to sue VIZIO for infringement and recover damages.

25. VIZIO, Inc. ("VIZIO") is a corporation organized and existing under the laws of the state of California with its principal place of business located at 39 Tesla, Irvine, California, 92618.

26. VIZIO is in the business of designing, manufacturing, importing, selling for importation, and/or selling after importation, into the United States, smart televisions that playback streaming video and audio.

## IV. JURISDICTION & VENUE

27. This action for patent infringement arises under the patent laws of the United States, Title 35 of the United States Code.

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

29. This Court has general and specific jurisdiction over VIZIO. A corporation

COMPLAINT

organized and existing under California law, VIZIO has its principal place of business at 39 Tesla, Irvine, California, 92618. VIZIO transacts and conducts business in this District and the State of California and has purposefully availed itself of the privileges of conducting business therein. DivX's causes of action arise directly from VIZIO's business contacts and activities within the State of California and this District. Upon information and belief, VIZIO has committed acts of infringement, both directly and indirectly, within this District and the State of California by, *inter alia*, using, selling, offering for sale, importing, advertising, and/or promoting products that infringe one or more claims of the Asserted Patents. VIZIO directly and/or through intermediaries, uses, sells, imports, ships, distributes, offers for sale, advertises, and otherwise promotes its products which infringe the Asserted Patents in the United States, in the State of California, and in this District. Upon information and belief, VIZIO solicits customers in the State of California and this District, and has customers who are residents of the State of California and this District and who use VIZIO's products in the State of California and in this District.

30. VIZIO has committed and continues to commit acts of patent infringement, including making and using infringing apparatuses and systems including smart televisions and components thereof, within this District.

31. Venue is proper for VIZIO in this District under 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because, as described above, a substantial part of the events giving rise to DivX's claims occurred in this District, and because VIZIO is organized under California law, and is headquartered, and has its principal place of business within this District.

## V. THE ASSERTED PATENTS

32. On November 13, 2007, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,295,673 ("the 673 Patent"), entitled "Method and System for Securing Compressed Digital Video," to inventors Eric W. Grab and Adam H. Li. DivX owns by assignment the entire right, title, and interest in the 673

COMPLAINT

Patent, including the right to sue and recover damages for past and present infringement thereof. A copy of the 673 Patent is attached to the Complaint as Exhibit 1.

33. The claimed inventions of the 673 Patent address significant technical problems in streaming digital video to playback devices. As existed in the prior art and continues to be the case today, a stream of compressed digital video content has a specific structure arranged so that it can be interpreted properly by a playback device and converted to pixels on the display screen. *See, e.g.,* Exhibit 1 (673 Patent) at 1:24-49 (describing display of digital video as pixels), 3:3-11 (describing standards used for video compression and decompression), 5:55-6:24 (describing, with respect to FIG. 5, "types of frames within a video stream . . . formatted consistently with the MPEG-4 standard"), 7:15-28 (describing specific organization of MPEG-4 stream), 9:6-10:17 (describing, with respect to FIG. 9, "the structure of an unencrypted video stream and of a video stream encrypted in accordance with the present invention").

34. Decoding a digital video stream on a playback device, such as a television, tablet or smartphone, is "very computationally intensive, with the degree of computational intensity varying directly with the extent of compression." *Id.* at 1:63-2:9. Therefore, "[a]nything that adds to computational intensity over and above the processing overhead associated with the applicable decoding process is undesirable, since this leads to increased system complexity and expense." *Id.* In particular, "[a]ny processing of frames required in addition to decoding (*e.g.*, decryption) consumes yet further processing resources." *Id.* at 3:12-19 (describing FIG. 3). Decryption adds to the computational overhead associated with decoding. "[T]he processing power necessary required [sic] to both decrypt and decode a sequence of frames" that have been encrypted is higher than "the relatively smaller amount of processing power required to decode unprotected (i.e., unencrypted) frames." *Id.* at 3:34-51 (describing FIG. 4). As such, at the time of the 673 inventions, "a need exist[ed] for an adequately secure technique for bounding the resources consumed during decryption, thereby reducing peak processing requirements." *Id.* at 3:49-51. The 673 invention provides for these efficiencies while

COMPLAINT

also providing the requisite content security. The 673 Patent, therefore, addresses a technical problem: allowing adequate content security while limiting the resources consumed during video decryption. *See, e.g., id.* at 3:39-51.

35.    The 673 patent claims recite specific technical solutions to solve these technical problems with compressed digital video content that provide sufficient security but requires less processing power to decrypt. The 673 Patent claims are directed to improvements to the functionality of computer systems that perform digital video encoding, encryption, decryption, and decoding, by providing a new structure of encrypted video data, and how a video decoder is configured to decrypt and decode that new structure. The new structure of encrypted video data of the 673 invention includes frame decryption information synchronized with encrypted frames in the video data. *See, e.g.*, *id.* at 3:55-4:42; 5:25-32, 6:39-7:14 (describing FIG. 6, including new process for creating the new structure of encrypted video data), 7:15- 8:42 (describing FIG. 7, including new process for generating "frame decryption information" for the new structure of encrypted video data), 8:43-9:5 (describing FIG. 8, including new process for decrypting and decoding the new structure of encrypted video data), 9:6-10:17 (describing FIG. 9, including structure of the new video data format). In claim 29, the compressed encrypted frames are partially encrypted, such that the frame decryption information "identifies the specific portions of the frames to be decrypted and the applicable frame decryption key" *Id.* at 14:18-45 (claim 29). By only partially encrypting frames in the video stream, the new structure of encrypted video data reduces the computing resources required for decrypting and decoding the data, as depicted, for example, in FIG. 10.

COMPLAINT





36.    The top line in the figure represents the processing power needed to decrypt and decode a fully encrypted stream, the bottom line represents the power needed to decode an unencrypted stream, and the middle line represents the power needed to decrypt and decode the new file structure of the invention—reducing the resources needed from a fully encrypted approach while providing more security than the unencrypted approach. As such, "[t]he bounded encryption approach of the invention requires substantially less peak processing power (*see, e.g.*, frames 8, 15, and 20) during the decryption process than would otherwise be required using standard encryption techniques." *Id.* at 10:18-34. By synchronizing frame decryption information with the encrypted frames in the video data, the new structure of encrypted video data improves the performance of the computer system executing decryption and decoding operations, making decryption less computationally intensive and reducing errors that could be caused by a lack of synchronization.   Partial frame encryption, combined with frame decryption information synchronized with encrypted frames to permit decryption of those frames, with the resultant decrypted frames passed to an entropy decompression unit for decompression and display, was not well-known, routine, or conventional at the time of the 673 inventions.

37.     On March 5, 2019, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,225,588 ("the 588 Patent"), entitled "Playback Devices And Methods For Playing Back Alternative Streams Of Content Protected Using A Common Set Of Cryptographic Keys," to inventors Michael George Kiefer, Eric William Grab, and Jason Braness. DivX owns by assignment the entire right, title, and interest in the 588 Patent, including the right to sue and recover damages for past and present infringement thereof.  A copy of the 588 Patent is attached to the Complaint as Exhibit 2.

38.     The claimed inventions of the 588 Patent address a technical problem: providing content security while reducing the computational burdens of processing cryptographic information for alternative video streams during Adaptive Bitrate Streaming ("ABS"). "In many instances, content is divided into multiple streams," and "some streams can be encoded as alternative streams that are suitable for different network connection bandwidths." *See, e.g.*, Exhibit 2 (588 patent) at 1:45-58. In ABS, "the source media is encoded at multiple bitrates and the playback device or client switches between streaming the different encodings depending on available resources." *See, e.g.*, *id.* at 1:59-67. Prior to the 588 inventions, each stream used different cryptographic information for authorizing secure playback. *See, e.g.*, *id.* at 8:37-61, 9:65-10:31. Storing and processing cryptographic information for each stream required more computing resources and increased the cost and complexity of the playback device, and it can also result in stalls and delays when switching among video streams with different bitrates. *See, e.g.*, *id.* Accordingly, a need existed for a more efficient and high-performance DRM implementation for ABS that would reduce the computer memory consumed by cryptographic information and reduce the time and computing resources consumed by playback devices when switching among video streams having different bitrates.

39.     The 588 Patent claims recite specific technical solutions to solve these technical problems with playback device implementations and methods that reduce the

COMPLAINT

computer memory and other resources consumed by cryptographic information during ABS. The 588 claims are directed to improvements to the functionality of computer systems that perform digital video decryption and playback during ABS. More specifically, the 588 claims are directed to a new index file structure and a new structure of encrypted data for ABS, how a playback device is configured to request, decrypt, and play back video data using the new structures (claim 1 and dependents), and how to request, decrypt, and play back video data using the new structures (claim 12 and dependents).

40. The new index file structure and a new structure of encrypted data of the 588 inventions incorporates alternative video streams including partially encrypted video frames that are encrypted using a set of common keys, a top-level index identifying those streams, and a container index containing byte ranges for portions of a stream. With the 588 inventions, "each of the alternative streams of protected content are encrypted using common cryptographic information." *See, e.g.*, *id.* at Abstract; *see also id.* at 2:66-3:30, 8:37-61, 9:65-10:31. Prior ABS video encryption formats and index files did not encrypt alternative streams using a set of common keys. The new index file structure and new structure of encrypted data of the 588 Patent, and the devices and methods used to process the new index file structure and encrypted data structure, therefore were not well-known, routine, and conventional at the time of the 588 inventions.

41. The new index file structure and new encrypted data structure of the 588 inventions, and the devices and methods used to process the new index file structure and encrypted data structure, provide technical benefits that improve the functionality and capabilities of computer systems performing these operations. Encrypting alternative video streams using a set of common keys and identifying those encrypted streams using a top-level index file, allows playback devices to switch between alternative video streams during ABS and to decrypt those streams without having to perform the computationally intensive processes of obtaining and processing additional

cryptographic information, while maintaining the security of the video content. *Id.* at 8:55-61, 10:22-31. The new file structures of the 588 inventions, and new methods for processing those structures, therefore reduce the computing resources needed to provide ABS while providing content security. The 588 inventions, therefore, allow an ABS system to switch among video streams having different bitrates more efficiently, consuming fewer computing resources and avoiding interruptions in video playback, improving the performance of the computing system. *Id.* The 588 Patent's new encryption architecture for digital video streams that uses partial-frame encryption and common encryption keys to encode alternate video streams, reducing playback stalls and improving performance during ABS while maintaining content security, was not well-known, routine, or conventional at the time of the 588 inventions.

42.     On August 24, 2021, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,102,553 ("the 553 Patent"), entitled "Systems and Methods for Secure Playback of Encrypted Elementary Bitstreams," to inventors Francis Yee-Dug Chan, Kourosh Soroushian, and Andrew Jeffrey Wood. DivX owns by assignment the entire right, title, and interest in the 553 Patent, including the right to sue and recover damages for past and present infringement thereof. A copy of the 553 Patent is attached to the Complaint as Exhibit 3.

43.     The 553 Patent addresses a technical problem: in digital multimedia distribution systems, "the multimedia file is authorized and decrypted in a demultiplexer and then transmitted downstream unencrypted to the decoder via an inter-communication data channel. This however can present a security problem due to the high value of the unencrypted but still encoded bitstream that can be captured during transmission. This bitstream is considered high-value since the encoded data can be easily multiplexed [which refers to repackaging into a multimedia file,] back into a container for unprotected and unauthorized views and/or distribution with no loss in the quality of the data." Exhibit 3 (553 Patent) at 6:59-65.

44.     Content providers need to make sure that only authorized users can access

COMPLAINT

and play back digital content. *See, e.g.*, *id.* at 1:39-43. This is a particular problem when the content is communicated over connections that are not secure and can be intercepted, such as when content is communicated "from one process or component to another process or component over an unsecured connection", such as between a "demultiplexer and a decoder over an unsecured connection." *See, e.g., id.* at 5:25-31; *see also id.* at 1:61-63 (explaining that "when communication or the transporting of information becomes unsecured or untrustworthy, such gaps need to be accounted for and filled"). Accordingly, a need existed to improve the distribution of digital content to enhance security of content that may be transported over an unsecured connection, while enabling efficient access to the content for the correct users. *Id.* at 1:59-61, 1:65-67.

45.     The 553 Patent provides a solution to this problem with specific ways to transport "encrypted multimedia content over an unsecured connection" such as from one process or component to another process or component to improve security and enable efficient distribution and playback of multimedia content. *See, e.g.*, *id.* at 1:36-37. The 553 Patent inventions package decryption information with digital video in a "container file" and allow processing of that file such that decryption can occur on the video decoder. *Id.* at 6:3-36, FIG. 1, FIG. 2. The 553 Patent claims are therefore directed to improvements to the functionality of computer systems that perform digital video decryption, decoding, and playback. The 553 Patent claims are directed to a playback device with a new structure of container file containing encrypted digital video; how a playback device is configured to decrypt, decode, and play back the new file structure (claims 1, 11, and their dependents); and the method of decrypting, decoding, and playing back that new file structure (claim 19 and dependents). Prior video container file formats did not contain this specific structure of partially encrypted frames and cryptographic information necessary for decryption and decoding. This new file structure, and the playback devices and methods used to decrypt and play back video structured in this new way, therefore were not well-known, routine, or conventional at the time of the 553 Patent inventions.

46.     The new structure of a container file containing encrypted digital video of the 553 Patent inventions and the playback devices and methods used to decrypt and play back video structured in this new way provide technical benefits that improve the functionality and capabilities of computer systems performing these operations. By providing partially encrypted video frames, coupled with specific cryptographic information describing the encrypted portion of each partially encrypted frame, and requiring deciphering of frame keys using the cryptographic material, the new container file format improves the security of the video data and reduces the processing resources required to decrypt and play back the video. The 553 Patent inventions "do not secure the transmission but rather secure the data being transmitted via the unsecured connection." *See, e.g.*, *id.* at 5:33-51. The inventions accomplish this using enciphered decryption key information in the multimedia data, and not deciphering those keys to decrypt the multimedia until the data is at the decoder and no longer being transmitted. *See, e.g.*, *id.*; *see also* 6:57-7:9. As a result, for example, "by allowing the decryption to occur on the decoder the bitstream is protected even if the connection is compromised and an unauthorized component or process intercepts the bitstream." *See, e.g.*, *id.* at 5:41-44.

47.     On June 29, 2021, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,050,808 ("the 808 Patent"), entitled "Systems and Methods for Seeking Within Multimedia Content During Streaming Playback," to inventor Roland Osborne.  DivX owns by assignment the entire right, title, and interest in the 808 Patent, including the right to sue and recover damages for past and present infringement thereof.  A copy of the 808 Patent is attached to the Complaint as Exhibit 4.

48.     The 808 Patent addresses problems caused by inferior prior art systems: startup delay, streaming options limited to single track files, audio files, and/or files without subtitles, and lack of or limited trick play functionality. The 808 Patent's new playback methods and systems address multiple technical problems. Existing digital video playback systems facilitated progressive playback for only short video clips

COMPLAINT

because the systems downloaded video files *linearly*, from beginning to end. Exhibit 4 (808 Patent) at 1:48-49. Playback would begin only after the player had "buffered enough data to provide a likelihood that the media [would] play without interruption." *Id.* at 1:49-51.  Because playback would begin only after the player had downloaded sufficient data, longer content would suffer from startup delay: "The buffering requirement can either be a fixed amount suitable for a large percentage of content, or a dynamic amount, where the player infers how much data is required to play the entire content without suffering buffer under-run." *Id.* at 1:51-55. Thus, existing systems did not support random seeking, trick play (for example, pausing, rewinding, fast forwarding, skipping), or playing back longer content (i.e., feature-length movies), and was not suitable for use with Internet servers that "store files that can contain multiple titles, titles that include multiple audio tracks, and/or titles that include one or more subtitle tracks." *Id.* at 1:55-59, 2:37-42; *see also id.* at 2:7-17 ("When a long clip is started, it is impossible to seek or fast-forward to a point in the file that has not already been downloaded."). Multi-track media, in particular, was not suitable for the existing smooth trick play functionality as the playback device must download the data for the other tracks, even if only certain tracks have been chosen for playback. *See id.* at 10:49-11:15. Such systems were likely to suffer from buffer under-run when receiving trick play instructions, resulting in playback stalls and startup delays caused by access delays in data transmission and computing burdens placed on the network and device.

49.    Some existing streaming systems were "server-driven," as opposed to receiver-driven (*e.g.*, based on instructions from the player). In server-driven systems, "the server parse[d] the data file and determine[d] which data to send" for playback. *Id.* at 1:65-66. Server-driven systems required custom computing systems, which increased expense: "[s]tandard HTTP web servers . . . do not typically provide this functionality, and custom web servers providing this functionality often scale poorly when called upon to deliver content simultaneously to a large number of players." *Id.* at 1:67-2:4. These systems required expensive, impractical, inefficient custom server designs unable to

COMPLAINT

simultaneously supply digital video content to a large number of playback devices. *Id.*

50.     Accordingly, as demand for streaming digital video content increased, a need existed for a new, improved playback implementation able to facilitate (1) efficient, non-linear, partial-download playback with trick play functionality, (2) receiver-driven, partial-download playback compatible with HTTP, and (3) delivery of video streaming to a large number of devices.

51.     The 808 Patent provides specific, technical solutions to the technical challenges presented by existing playback systems, specifically, for instance by enabling the playback device to support playback of multiple audio and subtitle tracks without downloading them all. *See, e.g.*, *id.* at 2:23-39. The system selects video, audio, and/or subtitle tracks among other tracks in the file and requests specific portions of the selected tracks for download, buffering, and playback based on instructions at the playback device. The 808 Patent claims are directed to improvements to the functionality of computers that request, receive, download, buffer, and play back digital video, audio, and subtitle content stored in container files on a remote server. The 808 Patent claims are directed to improved devices (claim 1 and dependents) and methods (claim 17 and dependents).

52.     One aspect of the 808 Patent inventions recites a technical solution related to the player's ability to deliver requests to the server for specific portions of a video file. For example, "[i]n several embodiments, the ability to provide full featured progressive playback is due in part to the tight coupling of the playback engine for the media sequence (i.e., the system that decodes and plays back the encoded media) with a transport protocol that provides random access to the remote file. Interfacing of the playback engine with the transport protocol via a file parser can reduce latency and enable the client and media server to operate in parallel improving download efficiency and interactivity." *Id.* at 2:43-51. Further, the multi-track media "files are formatted to include an index to the data within the file and a transport protocol that allows for downloading specific byte ranges within a file." *Id.* at 2:51-55; *see also id.* at 6:25-49

("When the media file includes an index, a device configured with a client application in accordance with an embodiment of the invention can use the index to determine the location of various portions of the media. Therefore, the index can be used to provide a user with 'trick play' functions. . . . [T]he client application requests portions of the media file using a transport protocol that allows for downloading of specific byte ranges within the media file.").

53.     Another aspect of the technical solution provided by the inventions of the 808 Patent is the new ability for the client to "flush" or purge an existing "queue of pending byte range requests and establish a new queue of byte range requests," for example in response to a new trick play command received at the play back device that corresponds a different byte range of streaming media, such as a different scene or portion of the media, than is currently being requested by the playback device. *Id.* at 9:7-11. As the 808 Patent explains, when "a user provides a 'trick play' instruction, previously requested byte ranges may no longer be required in order to continue playing media in the manner instructed by the user." The new playback devices of the 808 Patent "possess the ability to flush the queue of pending byte range requests and establish a new queue of byte range requests. An advantage of flushing a request queue is that there is no latency associated with waiting until previously requested byte ranges have been requested prior to downloading the now higher priority byte ranges." *Id.* at 9:7-15.

54.     The 808 Patent inventions provide an improved playback implementation that enables a client application at the player to commence playing video content and to request non-sequential portions of the video file without receiving the complete video file. *Id.* at 5:33-54. The inventions create a client computing application capable of implementing progressive playback and supporting trick play functionality for files containing multiple titles and for titles with multiple media tracks. *Id.*; *Id.* at 2:26-42. These implementations were new and not well-known, routine, or conventional at the time of the 808 Patent inventions.

55.     The 808 Patent provides technical—not merely conceptual—solutions to

COMPLAINT

recognized, but unsolved progressive playback shortcomings. The 808 Patent inventions specify a client application with multiple "abstraction layers" to facilitate progressive playback with trick play functionality. *Id.* at 7:16-37. One exemplary embodiment of the player disclosed by the 808 Patent includes a download manager "that is responsible for coordinating the downloading of specific byte ranges of a file from a remote server"; a playback engine "that coordinates the playback of a media file in response to user interactions"; and a file parser that "interfaces between the playback engine and the download manager" and "maps high level data requests from the playback engine to specific byte ranges that can then be requested using the download manager." *Id.*



FIG. 4

808 Patent, FIG. 4.

## VI.   THE ACCUSED PRODUCTS

56.   The Accused Products include VIZIO's D-Series, M-Series, P-Series, V-Series, and OLED 4K HDR line of smart televisions. Infringement charts of the

exemplary product VIZIO V-Series 43" 4K Smart TV (V435-J01) are attached as Exhibits 5-8.

57.     Upon information and belief, all Accused Products are configured and operate in substantially the same way with respect to the Asserted Patents asserted against those products.

58.     Without discovery, DivX cannot exhaustively identify all VIZIO devices that infringe the Asserted Patents.  DivX reserves its right to supplement its allegations, to further amend this Complaint, and to add defendants and accused products in the future if necessary.

## VII.   COUNT I: INFRINGEMENT OF U.S. PATENT NO. 7,295,673

59.     DivX incorporates and realleges paragraphs 1-58 above as if fully set forth herein.

60.     On information and belief, VIZIO has infringed and continues to infringe one or more claims of the 673 Patent, including but not limited to claims 29-32, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things: making, using, offering for sale, selling, and/or importing into the United States without authority, the Accused Products. For example, VIZIO directly infringes at least independent claim 29 of the 673 Patent when it operates the Accused Products, such as for internal testing and development.

61.     A claim chart applying independent claim 29 of the 673 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product, can be found at Exhibit 5. VIZIO directly infringes the asserted claims by making, using (*e.g.*, when testing streaming services such as HBO Max with the VIZIO Accused Products), selling, offering to sell, and/or importing the Accused Products, each of which comprises the claimed decrypting digital video decoder. The descriptions in Exhibit 5 are preliminary and based on publicly available information. Plaintiff expects to further develop the evidence of infringement by the Accused Products after obtaining discovery from VIZIO in the course of this Action.

62.     VIZIO induces infringement of the asserted claims of the 673 Patent. At the very least, VIZIO was on notice of the 673 Patent and the accused infringement, as of the date when DivX counsel emailed VIZIO General Counsel and Corporate Secretary Jerry Ching-Jen Huang an electronic copy of the public version of the Complaint captioned *Certain Video Processing Devices and Components Thereof*, Inv. No. 337-3651 (institution pending), filed with the United States International Trade Commission with detailed infringement contentions on October 24, 2022. VIZIO was further placed on notice of the 673 Patent and the accused infringement by the filing and/or service of this Complaint.

63.     Upon information and belief, VIZIO's infringement of this patent continues to be willful, at least since VIZIO's knowledge of its infringement as described above.

64.     VIZIO knowingly and intentionally encourages at least: (1) unlicensed streaming service providers, such as Warner Bros. Discovery, Inc. and its HBO Max streaming service; and (2) end-users of the VIZIO-accused products, such as consumers in the United States, to directly infringe the 673 Patent.



The above screenshot of the HBO Max application running on the exemplary VIZIO TV Device was taken by, or on behalf of, DivX.

65.     For example, VIZIO provides the Accused Products as well as technical and business infrastructure, specifications, software, know-how, and other support to instruct and enable unlicensed streaming service providers to make, use, sell/lease, and/or offer for sale/lease applications that provide video streaming services for

installation on the VIZIO Accused Products, or otherwise provide video streaming services to the VIZIO Accused Products. Once installed, or otherwise when such services are used, such applications in combination with the VIZIO Accused Products directly infringe the 673 Patent.

66.    For example, VIZIO provides application offerings and associated infrastructure, such as VIZIO's SmartCast® platform, to enable streaming service providers to provide their VIZIO device-specific streaming applications to end users, so that such end users can use such streaming applications using the VIZIO Accused Products. For example, VIZIO states that its SmartCast® platform is "the (incredibly) smart platform that powers every VIZIO TV." *See* https://www.vizio.com/en/smartcast. The following screenshots depict the various video content that may be consumed on the VIZIO SmartCast® platform and the ways to access such content on the platform:



*See* https://www.vizio.com/en/smart-tv-apps.

COMPLAINT



*See* https://www.vizio.com/en/smart-tv-apps.



*See* https://www.vizio.com/en/smart-tv-apps?appName=prime-video&appId= vizio.amazon.

24



*See* https://www.vizio.com/en/smart-tv-apps?appName=hbomax&appId=vizio.hbomax.



*See* https://www.vizio.com/en/smartcast.

COMPLAINT



*See* https://www.vizio.com/en/smartcast.



*See* https://www.vizio.com/en/smartcast.

67.   VIZIO further encourages unlicensed third-party streaming service providers to develop such streaming service applications for use with the VIZIO Accused Products. For example, VIZIO encourages third-party streaming service providers to "[j]oin the VIZIO platform" and to fill out a form to be a Content Partner. *See* https://www.vizio.com/en/content-partners. VIZIO touts its "[s]imple integration,"

COMPLAINT

"[d]omestic support team," "[i]nnovative technologies," and "[m]illions of TVs" as reasons why third-party streaming service providers should "[b]ring [their] content or app to millions of households" that use the VIZIO Accused Products. *Id.* The following screenshots include such advertisements that encourage Content Partners to join the VIZIO SmartCast® Platform:



*See* https://www.vizio.com/en/content-partners.



*See* https://www.vizio.com/en/content-partners.

COMPLAINT



*See* https://www.vizio.com/en/content-partners.



*See* https://www.vizio.com/en/content-partners.

68.     Unlicensed streaming service providers thereby directly infringe at least by making and using infringing apparatuses in conjunction with the VIZIO Accused Products, such as when testing applications developed for use with the VIZIO Accused

Products. Such activities directly infringe, as described, for example, at Exhibit 5, a claim chart applying independent claim 29 of the 673 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

69.   VIZIO knowingly induces such infringement by providing the Accused Products as well as the technical and business infrastructure, know-how, and other support to enable and facilitate such infringement, examples of which are discussed above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 673 Patent, or at the very least, because VIZIO has been and remains on notice of the 673 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce.

70.   VIZIO also provides the VIZIO Accused Products and instructions to end users so that such end users will use the Accused Products in an infringing manner. For example, VIZIO promotes the use of the HBO Max application on the VIZIO Accused Products,  see  https://www.vizio.com/en/press/2021/sept/hbo-max-app-now-available-on-vizio-smartcast-,  with the intent that end users use the application to stream video to the VIZIO Accused Products. When end users do so, this results in direct infringement of the 673 Patent, as described, for example, at Exhibit 5, a claim chart applying independent claim 29 of the 673 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

71.   VIZIO provides the streaming platform for the HBO Max service, which allows its consumers to "access applications on [their] SmartCast TV," such as HBO Max, with "[n]o app downloading [] required." *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. The following screenshot shows an example of those instructions:

COMPLAINT

*See*        https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US.

72.    As shown above, VIZIO provides consumers with instructions on how to access "all available applications" on the VIZIO Accused Products and thereby induces consumers to infringe the claims of the 673 Patent. *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO instructs end users to access the SmartCast® platform by "press[ing] the input button and choose the 'SmartCast' input. Or press[ing] the V key or Home key near the center of your remote." *Id.*

73.    VIZIO instructs and encourages end users to use unlicensed third-party streaming services in a manner that directly infringes the asserted 673 Patent claims. For example, VIZIO provides an application row and associated infrastructure to enable end users to stream video using the VIZIO Accused Products. "Currently all available applications are displayed in the app row of the SmartCast Home. No app downloading is required. . . . If the app you're looking for doesn't appear in your TVs app list then it currently isn't available on the SmartCast platform, and there is no way to download it

COMPLAINT

to your TV's home screen." *See*, https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO markets its Accused Products as continually updating (or that updates "happen automatically") in that VIZIO "regularly release[s] updates to the TV that add new features and applications," and that "[t]hese updates will automatically download to your TV, once the app becomes available to VIZIO and if your TV is connected to the internet." *Id.*



*See* VIZIO V-Series User Manual for Models: V435-J01, V505-J01, V505-J09, V505C-J09, V555-J01, V585-J01, V655-J04, V655-J09, V705-J01, V705-J03, V705x-J03 & V755-J04 at 29.

74.     VIZIO encourages and instructs end users of the VIZIO Accused Products that "SmartCast Home lets you discover, stream, and control your content like never before," because they can "[a]ccess top apps, like Netflix, Disney+, and Hulu, by using the remote to easily browse and launch content directly from the home screen" and "SmartCast Home makes finding something to watch easy and fun." *See* VIZIO V-Series User Manual for Models: V435-J01, V505-J01, V505-J09, V505C-J09, V555-J01, V585-J01, V655-J04, V655-J09, V705-J01, V705-J03, V705x-J03 & V755-J04 at 29.

75.     When end users use the Accused Products with unlicensed streaming services, this results in direct infringement of the 673 Patent, as described, for example,

COMPLAINT

at Exhibit 5, a claim chart applying independent claim 29 of the 673 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

76.     VIZIO customers such as end users directly infringe by using the Accused Products in their intended manner to infringe, *e.g.*, by using the VIZIO Accused Products to stream video, thereby making and/or using an infringing apparatus. VIZIO knowingly induces such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 673 Patent, or at the very least, because VIZIO has been and remains on notice of the 673 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce.

77.     VIZIO's acts of infringement have caused and continue to cause damage to Plaintiff and Plaintiff is entitled to recover from VIZIO damages sustained as a result of VIZIO's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

## VIII.  COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,225,588

78.     DivX incorporates and realleges paragraphs 1-58 above as if fully set forth herein.

79.     On information and belief, VIZIO has infringed and continues to infringe one or more claims of the 588 Patent, including but not limited to claims 1-10 and 12-21, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things: making, using, offering for sale, selling, and/or importing into the United States without authority, the Accused Products.  For example, VIZIO directly infringes at least independent claims 1 and 12 of the 588 Patent when it operates the Accused Products, such as for internal testing and development.

80.     A claim chart applying independent claim 1 of the 588 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming

COMPLAINT

service as an exemplary product, can be found at Exhibit 6. VIZIO directly infringes the asserted claims by making, using (*e.g.*, when testing the HBO Max service with the VIZIO Accused Products), selling, offering to sell, and/or importing the VIZIO Accused Products, each of which comprises the claimed playback device. The descriptions in Exhibit 6 are preliminary and based on publicly available information. Plaintiff expects to further develop the evidence of infringement by the Accused Products after obtaining discovery from VIZIO in the course of this Action.

81.    VIZIO induces infringement of the asserted claims of the 588 Patent. At the very least, VIZIO was on notice of the 588 Patent and the accused infringement, as of the date when DivX counsel emailed VIZIO General Counsel and Corporate Secretary Jerry Ching-Jen Huang an electronic copy of the public version of the Complaint captioned *Certain Video Processing Devices and Components Thereof*, Inv. No. 337-3651 (institution pending), filed with the United States International Trade Commission with detailed infringement contentions on October 24, 2022. VIZIO was further placed on notice of the 588 Patent and the accused infringement by the filing and/or service of this Complaint.

82.    Upon information and belief, VIZIO's infringement of this patent continues to be willful, at least since VIZIO's knowledge of its infringement as described above.

83.    VIZIO knowingly and intentionally encourages at least: (1) unlicensed streaming service providers, such as Warner Bros. Discovery, Inc. and its HBO Max streaming service; and (2) end-users of the VIZIO-accused products, such as consumers in the United States, to directly infringe the 588 Patent.

COMPLAINT

The above screenshot of the HBO Max application running on the exemplary VIZIO TV Device was taken by, or on behalf of, DivX.

84.     For example, VIZIO provides the Accused Products as well as the technical and business infrastructure, specifications, software, know-how, and other support to instruct and enable unlicensed streaming service providers to make, use, sell/lease, and/or offer for sale/lease applications that provide video streaming services for installation on the VIZIO Accused Products, or otherwise provide video streaming services to the VIZIO Accused Products. Once installed, or otherwise when such services are used, such applications in combination with the VIZIO Accused Products directly infringe the 588 Patent.

85.     For example, VIZIO provides application offerings and associated infrastructure, such as VIZIO's SmartCast® platform, to enable streaming service providers to provide their VIZIO device-specific streaming applications to end users, so that such end users can use such streaming applications using the VIZIO Accused Products. For example, VIZIO states that its SmartCast® platform is "the (incredibly) smart platform that powers every VIZIO TV." *See* https://www.vizio.com/en/smartcast. The following screenshots depict the various video content that may be consumed on the VIZIO SmartCast® platform and the ways to access such content on the platform:

COMPLAINT



*See* https://www.vizio.com/en/smart-tv-apps.



*See* https://www.vizio.com/en/smart-tv-apps.

COMPLAINT

1

2

3

4

5

6

7

8

9



10   *See* https://www.vizio.com/en/smart-tv-apps?appName=prime-video&appId=

11   vizio.amazon.

12

13

14

15

16   

17

18

19

20

21   *See* https://www.vizio.com/en/smart-tv-apps?appName=hbomax&appId=

22   vizio.hbomax.

23

24

25

26

27

28

36



*See* https://www.vizio.com/en/smartcast.



*See* https://www.vizio.com/en/smartcast.

COMPLAINT



*See* https://www.vizio.com/en/smartcast.

86.     VIZIO further encourages third-party streaming service providers to develop such streaming service applications for use with the VIZIO Accused Products. For example, VIZIO encourages third-party streaming service providers to "[j]oin the VIZIO platform" and to fill out a form to be a Content Partner. *See* https://www.vizio.com/en/content-partners. VIZIO touts its "[s]imple integration," "[d]omestic support team," "[i]nnovative technologies," and "[m]illions of TVs" as reasons why third-party streaming service providers should "[b]ring [their] content or app to millions of households" that use the VIZIO Accused Products. *Id.* The following screenshots include such advertisements that encourage Content Partners to join the VIZIO SmartCast® Platform:



COMPLAINT

*See* https://www.vizio.com/en/content-partners.



*See* https://www.vizio.com/en/content-partners.

*See* https://www.vizio.com/en/content-partners.

COMPLAINT



*See* https://www.vizio.com/en/content-partners.

87.    Unlicensed streaming service providers thereby directly infringe at least by making and using infringing apparatuses in conjunction with the VIZIO Accused Products, such as when testing applications developed for use with the VIZIO Accused Products.  Such activities directly infringe, as described, for example, at Exhibit 6, a claim chart applying independent claim 1 of the 588 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

88.    VIZIO knowingly induces such infringement by providing the Accused Products as well as the technical and business infrastructure, know-how, and other support to enable and facilitate such infringement, examples of which are discussed above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 588 Patent, or at the very least, because VIZIO has been and remains on notice of the 588 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce

89.     VIZIO also provides the VIZIO Accused Products and instructions to end users so that such end users will use the Accused Products in an infringing manner. For example, VIZIO promotes the use of the HBO Max application on the VIZIO Accused Products,  see  https://www.vizio.com/en/press/2021/sept/hbo-max-app-now-available-on-vizio-smartcast-, with the intent that end users use the application to stream video to the VIZIO Accused Products. When end users do so, this results in direct infringement of the 588 Patent, as described, for example, at Exhibit 6 a claim chart applying independent claim 1 of the 588 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

90.     VIZIO provides the streaming platform for the HBO Max service, which allows its consumers to "access applications on [their] SmartCast TV," such as HBO Max,  with  "[n]o  app  downloading  []  required."  *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US.  The  following  screenshot  shows  an  example  of  those instructions:

# How to add an App to your VIZIO Smart TV

To access applications on your SmartCast TV, press the input button and choose the 'SmartCast' input. Or press the V key or Home key near the center of your remote. Currently *all available applications* are displayed in the app row of SmartCast Home. No app downloading is required.

If you do not see the app you're looking for, you may still be able to watch that content using the TV's ChromeCast or Airplay features. If the app you're looking for doesn't appear in your TVs app list then it currently isn't available on the SmartCast platform, and there is no way to download it to your TV's home screen. While the app you're looking for may not currently be available, VIZIO does regularly release updates to the TV that add new features and applications. These updates will automatically download to your TV, once the app becomes available to VIZIO and if your TV is connected to the internet.  The great news is that there is No Download Required for you.  It will happen automatically.

**ChromeCast:**
Your Television has a  built-in Google ChromeCast feature. Chromecast gives you the ability to cast thousands of your favorite applications to your TV from your computer, smartphone, or tablet. For information on how to cast **Click Here**.

**AirPlay 2:**
SmartCast Televisions also have AirPlay 2 capabilities and many applications allow you to AirPlay content from your iOS device to your VIZIO SmartCast TV. For information on how to use the AirPlay 2 feature, **Click Here**.

COMPLAINT

*See*        https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US.

91.     As shown above, VIZIO provides consumers with the Accused Products as well as instructions on how to access "all available applications" on the VIZIO Accused Products and thereby induces consumers to infringe the claims of the 588 Patent. *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO instructs end users to access the SmartCast® platform by "press[ing] the input button and choose the 'SmartCast' input. Or press[ing] the V key or Home key near the center of your remote." *Id.*

92.     VIZIO instructs and encourages end users to use unlicensed third-party streaming services in a manner that directly infringes the asserted 588 Patent claims. For example, VIZIO provides an application row and associated infrastructure to enable end users to stream video using the VIZIO Accused Products.  "Currently all available applications are displayed in the app row of the SmartCast Home. No app downloading is required. . . . If the app you're looking for doesn't appear in your TVs app list then it currently isn't available on the SmartCast platform, and there is no way to download it to your TV's home screen." *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO markets its Accused Products as continually updating (or that updates "happen automatically") in that VIZIO "regularly release[s] updates to the TV that add new features and applications," and that "[t]hese updates will automatically download to your TV, once the app becomes available to VIZIO and if your TV is connected to the internet." *Id.*

VIZIO V-Series User Manual for Models: V435-J01, V505-J01, V505-J09, V505C-J09, V555-J01, V585-J01, V655-J04, V655-J09, V705-J01, V705-J03, V705x-J03 & V755-J04 at 29.

93.    VIZIO encourages and instructs end users of the VIZIO Accused Products that "SmartCast Home lets you discover, stream, and control your content like never before," because they can "[a]ccess top apps, like Netflix, Disney+, and Hulu, by using the remote to easily browse and launch content directly from the home screen" and "SmartCast Home makes finding something to watch easy and fun." VIZIO V-Series User Manual for Models: V435-J01, V505-J01, V505-J09, V505C-J09, V555-J01, V585-J01, V655-J04, V655-J09, V705-J01, V705-J03, V705x-J03 & V755-J04 at 29.

94.    When end users use the Accused Products to download and stream unlicensed streaming services, this results in direct infringement of the 588 Patent, as described, for example, at Exhibit 6 a claim chart applying independent claim 1 of the 588 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

95.    VIZIO customers such as end users directly infringe by using the Accused Products in their intended manner to infringe, *e.g.*, by using the VIZIO Accused Products to stream video, thereby making and/or using an infringing apparatus. VIZIO knowingly

COMPLAINT

induces such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 588 Patent, or at the very least, because VIZIO has been and remains on notice of the 588 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce.

96.    VIZIO's acts of infringement have caused and continue to cause damage to Plaintiff and Plaintiff is entitled to recover from VIZIO damages sustained as a result of VIZIO's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

## IX.    COUNT III: INFRINGEMENT OF U.S. PATENT NO. 11,102,553

97.    DivX incorporates and realleges paragraphs 1-58 above as if fully set forth herein.

98.    On information and belief, VIZIO has infringed and continues to infringe one or more claims of the 553, including but not limited to claims 11-13, 15-17, 19-21, and 23-25 pursuant to 35 U.S.C. § 271(a), literally or under doctrine of equivalents, by, among other things: making, using, offering for sale, selling, and/or importing into the United States without authority, the Accused Products. The VIZIO 43-inch Class V-Series 4K UHD LED Smart TV, Model Number V435-J01, is depicted here:



COMPLAINT

*See* https://www.walmart.com/ip/VIZIO-43-Class-V-Series-4K-UHD-LED-Smart-TV-Newest-Model-V435-J01/103263240.

99.     A claim chart applying independent claim 11 of the 553 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product, can be found at Exhibit 7. VIZIO directly infringes the asserted claims by making, using (*e.g.*, when testing the HBO Max service with the VIZIO Accused Products), selling, offering to sell, and/or importing the VIZIO Accused Products, each of which comprises the claimed playback device for playing back encrypted video.

100.     VIZIO induces infringement of the asserted claims of the 553 Patent. At the very least, VIZIO was on notice of the 553 Patent and the accused infringement, as of the date when DivX counsel emailed VIZIO General Counsel and Corporate Secretary Jerry Ching-Jen Huang an electronic copy of the public version of the Complaint captioned *Certain Video Processing Devices and Components Thereof*, Inv. No. 337-3651 (institution pending), filed with the United States International Trade Commission with detailed infringement contentions on October 24, 2022. VIZIO was further placed on notice of the 588 Patent and the accused infringement by the filing and/or service of this Complaint.

101.     Upon information and belief, VIZIO's infringement of this patent continues to be willful, at least since VIZIO's knowledge of its infringement as described above.

102.     VIZIO knowingly and intentionally encourages at least: (1) unlicensed streaming service providers, such as Warner Bros. Discovery, Inc. and its HBO Max streaming service; and (2) end-users of the VIZIO-accused products, such as consumers in the United States, to directly infringe the 553 Patent.

The above screenshot of the HBO Max application running on the exemplary VIZIO TV Device was taken by, or on behalf of, DivX.

103.   For example, VIZIO provides the Accused Products as well as the technical and business infrastructure, specifications, software, know-how, and other support to instruct and enable unlicensed streaming service providers to make, use, sell/lease, and/or offer for sale/lease applications that provide video streaming services for installation on the VIZIO Accused Products, or otherwise provide video streaming services to the VIZIO Accused Products. Once installed, or otherwise when such services are used, such applications in combination with the VIZIO Accused Products directly infringe the 553 Patent.

104.   For example, VIZIO provides application offerings and associated infrastructure, such as VIZIO's SmartCast® platform, to enable streaming service providers to provide their VIZIO device-specific streaming applications to end users, so that such end users can use such streaming applications using the VIZIO Accused Products.  For example, VIZIO states that its SmartCast® platform is "the (incredibly) smart platform that powers every VIZIO TV." *See* https://www.vizio.com/en/smartcast. The following screenshots depict the various video content that may be consumed on the VIZIO SmartCast® platform and the ways to access such content on the platform:

COMPLAINT



*See* https://www.vizio.com/en/smart-tv-apps.



*See* https://www.vizio.com/en/smart-tv-apps.

COMPLAINT



*See* https://www.vizio.com/en/smart-tv-apps?appName=prime-video&appId=vizio.amazon.

*See* https://www.vizio.com/en/smart-tv-apps?appName=hbomax&appId=vizio.hbomax.

COMPLAINT



*See* https://www.vizio.com/en/smartcast.



*See* https://www.vizio.com/en/smartcast.

COMPLAINT

*See* https://www.vizio.com/en/smartcast.

105.  VIZIO further encourages third-party streaming service providers to develop such streaming service applications for use with the VIZIO Accused Products. For example, VIZIO encourages third-party streaming service providers to "[j]oin the VIZIO platform" and to fill out a form to be a Content Partner. *See* https://www.vizio.com/en/content-partners. VIZIO touts its "[s]imple integration," "[d]omestic support team," "[i]nnovative technologies," and "[m]illions of TVs" as reasons why third-party streaming service providers should "[b]ring [their] content or app to millions of households" that use the VIZIO Accused Products. *Id.* The following screenshots include such advertisements that encourage Content Partners to join the VIZIO SmartCast® Platform:



COMPLAINT

*See* https://www.vizio.com/en/content-partners.



*See* https://www.vizio.com/en/content-partners.



*See* https://www.vizio.com/en/content-partners.

COMPLAINT



*See* https://www.vizio.com/en/content-partners.

106.   Unlicensed streaming service providers thereby directly infringe at least by making and using infringing apparatuses in conjunction with the VIZIO Accused Products, such as when testing applications developed for use with the VIZIO Accused Products.  Such activities directly infringe, as described, for example, at Exhibit 7, a claim chart applying independent claim 11 of the 553 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

107.   VIZIO knowingly induces such infringement by providing the Accused Products as well as technical and business infrastructure, know-how, and other support to enable and facilitate such infringement, examples of which are discussed above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 553 Patent, or at the very least, because VIZIO has been and remains on notice of the 553 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce.

COMPLAINT

108.   VIZIO also provides the VIZIO Accused Products and instructions to end users so that such end users will use the Accused Products in an infringing manner. For example, VIZIO promotes the use of the HBO Max application on the VIZIO Accused Products,  see  https://www.vizio.com/en/press/2021/sept/hbo-max-app-now-available-on-vizio-smartcast-, with the intent that end users use the application to stream video to the VIZIO Accused Products. When end users do so, this results in direct infringement of the 553 Patent, as described, for example, at Exhibit 7 a claim chart applying independent claim 11 of the 553 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

109.   VIZIO provides the streaming platform for the HBO Max service, which allows its consumers to "access applications on [their] SmartCast TV" with "[n]o app downloading [] required." *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US.   The   following   screenshot   shows   an example of those instructions:

## How to add an App to your VIZIO Smart TV

To access applications on your SmartCast TV, press the input button and choose the 'SmartCast' input. Or press the V key or Home key near the center of your remote. Currently *all available applications* are displayed in the app row of SmartCast Home. No app downloading is required.

If you do not see the app you're looking for, you may still be able to watch that content using the TV's ChromeCast or Airplay features. If the app you're looking for doesn't appear in your TVs app list then it currently isn't available on the SmartCast platform, and there is no way to download it to your TV's home screen. While the app you're looking for may not currently be available, VIZIO does regularly release updates to the TV that add new features and applications. These updates will automatically download to your TV, once the app becomes available to VIZIO and if your TV is connected to the internet.   The great news is that there is No Download Required for you.   It will happen automatically.

**ChromeCast:**
Your Television has a  built-in Google ChromeCast feature. Chromecast gives you the ability to cast thousands of your favorite applications to your TV from your computer, smartphone, or tablet. For information on how to cast **Click Here**.
**AirPlay 2:**
SmartCast Televisions also have AirPlay 2 capabilities and many applications allow you to AirPlay content from your iOS device to your VIZIO SmartCast TV. For information on how to use the AirPlay 2 feature, **Click Here**.

COMPLAINT

*See*      https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US.

110.   As shown above, VIZIO provides consumers with instructions on how to access "all available applications" on the VIZIO Accused Products and thereby induces consumers to infringe the claims of the 553 Patent. *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO instructs end users to access the SmartCast® platform by "press[ing] the input button and choose the 'SmartCast' input. Or press[ing] the V key or Home key near the center of your remote." *Id.*

111.   VIZIO instructs and encourages end users to use unlicensed third-party streaming services in a manner that directly infringes the asserted 553 Patent claims. For example, VIZIO provides an application row and associated infrastructure to enable end users to stream video using the VIZIO Accused Products.  "Currently all available applications are displayed in the app row of the SmartCast Home. No app downloading is required. . . . If the app you're looking for doesn't appear in your TVs app list then it currently isn't available on the SmartCast platform, and there is no way to download it to your TV's home screen." *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO markets its Accused Products as continually updating (or that updates "happen automatically") in that VIZIO "regularly release[s] updates to the TV that add new features and applications," and that "[t]hese updates will automatically download to your TV, once the app becomes available to VIZIO and if your TV is connected to the internet." *Id.*

112.   VIZIO encourages and instructs end users of the VIZIO Accused Products that "SmartCast Home lets you discover, stream, and control your content like never before," because they can "[a]ccess top apps, like Netflix, Disney+, and Hulu, by using the remote to easily browse and launch content directly from the home screen" and "SmartCast Home makes finding something to watch easy and fun." VIZIO V-Series User Manual for Models: V435-J01, V505-J01, V505-J09, V505C-J09, V555-J01,

COMPLAINT

V585-J01, V655-J04, V655-J09, V705-J01, V705-J03, V705x-J03 & V755-J04 at 29.



VIZIO V-Series User Manual for Models: V435-J01, V505-J01, V505-J09, V505C-J09, V555-J01, V585-J01, V655-J04, V655-J09, V705-J01, V705-J03, V705x-J03 & V755-J04 at 29.

113.   When end users use the Accused Products to download and stream unlicensed streaming services, this results in direct infringement of the 553 Patent, as described, for example, at Exhibit 7 a claim chart applying independent claim 11 of the 553 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

114.   VIZIO customers such as end users directly infringe by using the Accused Products in their intended manner to infringe, *e.g.*, by using the VIZIO Accused Products to stream video, thereby making and/or using an infringing apparatus. VIZIO knowingly induces such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 553 Patent, or at the very least, because VIZIO has been and remains on notice of the 553 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce.

1.     VIZIO's acts of infringement have caused and continue to cause damage to Plaintiff and Plaintiff is entitled to recover from VIZIO damages sustained as a result of VIZIO's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

## X.     COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 11,050,808

115.    DivX incorporates and realleges paragraphs 1-58 above as if fully set forth herein.

116.    On information and belief, VIZIO has infringed and continues to infringe one or more claims of the 808 Patent, including but not limited to claims 1-7 and 12-17, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things: making, using, offering for sale, selling, and/or importing into the United States without authority, the Accused Products.  For example, VIZIO directly infringes at least independent claim 1 of the 808 Patent when it operates the Accused Products, such as for internal testing and development.

117.    A claim chart applying independent claim 1 of the 808 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product, can be found at Exhibit 8. VIZIO directly infringes the asserted claims by making, using (*e.g.*, when testing the HBO Max service with the VIZIO Accused Products), selling, offering to sell, and/or importing the VIZIO Accused Products, each of which comprises the claimed playback device. The descriptions in Exhibit 8 are preliminary and based on publicly available information.  Plaintiff expects to further develop the evidence of infringement by the Accused Products after obtaining discovery from VIZIO in the course of this Action. The VIZIO-43-Class-V-Series Accused Product is depicted here:

COMPLAINT

1
2
3
4
5
6
7
8
9



10  *See* https://www.walmart.com/ip/VIZIO-43-Class-V-Series-4K-UHD-LED-Smart-TV-
11  Newest-Model-V435-J01/103263240.

12      118.   VIZIO induces infringement of the asserted claims of the 808 Patent. At
13  the very least, VIZIO was on notice of the 808 Patent and the accused infringement, as
14  of the date when DivX counsel emailed VIZIO General Counsel and Corporate Secretary
15  Jerry Ching-Jen Huang an electronic copy of the public version of the Complaint
16  captioned *Certain Video Processing Devices and Components Thereof*, Inv. No. 337-
17  3651 (institution pending), filed with the United States International Trade Commission
18  with detailed infringement contentions on October 24, 2022. VIZIO was further placed
19  on notice of the 808 Patent and the accused infringement by the filing and/or service of
20  this Complaint.

21      119.   Upon information and belief, VIZIO's infringement of this patent continues
22  to be willful, at least since VIZIO's knowledge of its infringement as described above.

23      120.   VIZIO knowingly and intentionally encourages at least: (1) unlicensed
24  streaming service providers, such as Warner Bros. Discovery, Inc. and its HBO Max
25  streaming service; and (2) end-users of the VIZIO-accused products, such as consumers
26  in the United States, to directly infringe the 808 Patent.

27
28



The above screenshot of the HBO Max application running on the exemplary VIZIO TV Device was taken by, or on behalf of, DivX.

121. For example, VIZIO provides the Accused Products as well as technical and business infrastructure, specifications, software, know-how, and other support to instruct and enable unlicensed streaming service providers to make, use, sell/lease, and/or offer for sale/lease applications that provide unlicensed video streaming services for installation on the VIZIO Accused Products, or otherwise provide video streaming services to the VIZIO Accused Products. Once installed, or otherwise when such services are used, such applications in combination with the VIZIO Accused Products directly infringe the 808 Patent.

122. For example, VIZIO provides application offerings and associated infrastructure, such as VIZIO's SmartCast® platform, to enable streaming service providers to provide their VIZIO device-specific streaming applications to end users, so that such end users can use such streaming applications using the VIZIO Accused Products.  For example, VIZIO states that its SmartCast® platform is "the (incredibly) smart platform that powers every VIZIO TV." *See* https://www.vizio.com/en/smartcast. The following screenshots depict the various video content that may be consumed on the VIZIO SmartCast® platform and the ways to access such content on the platform:



*See* https://www.vizio.com/en/smart-tv-apps.



*See* https://www.vizio.com/en/smart-tv-apps.

COMPLAINT



*See* https://www.vizio.com/en/smart-tv-apps?appName=prime-video&appId=vizio.amazon.

*See* https://www.vizio.com/en/smart-tv-apps?appName=hbomax&appId=vizio.hbomax.

COMPLAINT



*See* https://www.vizio.com/en/smartcast.



*See* https://www.vizio.com/en/smartcast.



*See* https://www.vizio.com/en/smartcast.

123.   VIZIO further encourages third-party streaming service providers to develop such streaming service applications for use with the VIZIO Accused Products. For example, VIZIO encourages third-party streaming service providers to "[j]oin the VIZIO platform" and to fill out a form to be a Content Partner. *See* https://www.vizio.com/en/content-partners. VIZIO touts its "[s]imple integration," "[d]omestic support team," "[i]nnovative technologies," and "[m]illions of TVs" as reasons why third-party streaming service providers should "[b]ring [their] content or app to millions of households" that use the VIZIO Accused Products. *Id.* The following screenshots include such advertisements that encourage Content Partners to join the VIZIO SmartCast® Platform:



*See* https://www.vizio.com/en/content-partners.



*See* https://www.vizio.com/en/content-partners.

COMPLAINT



*See* https://www.vizio.com/en/content-partners.



*See* https://www.vizio.com/en/content-partners.

124.   Unlicensed streaming service providers thereby directly infringe at least by making and using infringing apparatuses in conjunction with the VIZIO Accused Products, such as when testing applications developed for use with the VIZIO Accused

COMPLAINT

Products.  Such activities directly infringe, as described, for example, at Exhibit 8, a claim chart applying independent claim 1 of the 808 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

125.   VIZIO knowingly induces such infringement by providing the Accused Products as well as technical and business infrastructure, know-how, and other support to enable and facilitate such infringement, examples of which are discussed above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 808 Patent, or at the very least, because VIZIO has been and remains on notice of the 808 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce.

126.   VIZIO also provides the VIZIO Accused Products and instructions to end users so that such end users will use the Accused Products in an infringing manner. For example, VIZIO promotes the use of the HBO Max application on the VIZIO Accused Products,  see  https://www.vizio.com/en/press/2021/sept/hbo-max-app-now-available-on-vizio-smartcast-, with the intent that end users use the application to stream video to the VIZIO Accused Products.  When end users do so, this results in direct infringement of the 808 Patent, as described, for example, at Exhibit 8 a claim chart applying independent claim 1 of the 808 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

127.   VIZIO provides the streaming platform for the HBO Max service, which allows its consumers to "access applications on [their] SmartCast TV", such as HBO Max,    with    "[n]o    app    downloading    []    required."    *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. The following screenshot shows an example of those instructions:

COMPLAINT

# How to add an App to your VIZIO Smart TV

To access applications on your SmartCast TV, press the input button and choose the 'SmartCast' input. Or press the V key or Home key near the center of your remote. Currently **all available applications** are displayed in the app row of SmartCast Home. No app downloading is required.

If you do not see the app you're looking for, you may still be able to watch that content using the TV's ChromeCast or Airplay features. If the app you're looking for doesn't appear in your TVs app list then it currently isn't available on the SmartCast platform, and there is no way to download it to your TV's home screen. While the app you're looking for may not currently be available, VIZIO does regularly release updates to the TV that add new features and applications. These updates will automatically download to your TV, once the app becomes available to VIZIO and if your TV is connected to the internet.  The great news is that there is No Download Required for you.  It will happen automatically.

**ChromeCast:**
Your Television has a  built-in Google ChromeCast feature. Chromecast gives you the ability to cast thousands of your favorite applications to your TV from your computer, smartphone, or tablet. For information on how to cast **Click Here**.
**AirPlay 2:**
SmartCast Televisions also have AirPlay 2 capabilities and many applications allow you to AirPlay content from your iOS device to your VIZIO SmartCast TV. For information on how to use the AirPlay 2 feature, **Click Here**.

*See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US.

128.  As shown above, VIZIO provides consumers with instructions on how to access "all available applications" on the VIZIO Accused Products and thereby induces consumers to infringe the claims of the 808 Patent. *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO instructs end users to access the SmartCast® platform by "press[ing] the input button and choose the 'SmartCast' input. Or press[ing] the V key or Home key near the center of your remote." *Id.*

129.  VIZIO instructs and encourages end users to use unlicensed third-party streaming services in a manner that directly infringes the asserted 808 Patent claims. For example, VIZIO provides an application row and associated infrastructure to enable end users to stream video using the VIZIO Accused Products.  "Currently all available applications are displayed in the app row of the SmartCast Home. No app downloading is required. . . . If the app you're looking for doesn't appear in your TVs app list then it

66                                                    COMPLAINT

currently isn't available on the SmartCast platform, and there is no way to download it to your TV's home screen." *See* https://support.vizio.com/s/article/How-to-add-an-App-to-your-VIZIO-Smart-TV?language=en_US. VIZIO markets its Accused Products as continually updating (or that updates "happen automatically") in that VIZIO "regularly release[s] updates to the TV that add new features and applications," and that "[t]hese updates will automatically download to your TV, once the app becomes available to VIZIO and if your TV is connected to the internet." *Id.*

130.   VIZIO encourages and instructs end users of the VIZIO Accused Products that "SmartCast Home lets you discover, stream, and control your content like never before," because they can "[a]ccess top apps, like Netflix, Disney+, and Hulu, by using the remote to easily browse and launch content directly from the home screen" and "SmartCast Home makes finding something to watch easy and fun."



VIZIO V-Series User Manual for Models: V435-J01, V505-J01, V505-J09, V505C-J09, V555-J01, V585-J01, V655-J04, V655-J09, V705-J01, V705-J03, V705x-J03 & V755-J04 at 29.

131.   When end users use the Accused Products to download and stream unlicensed streaming services, this results in direct infringement of the 808 Patent, as described, for example, at Exhibit 8 a claim chart applying independent claim 1 of the

COMPLAINT

808 Patent to the VIZIO Accused Products (and components thereof) operating with the HBO Max streaming service as an exemplary product.

132.   VIZIO customers such as end users directly infringe by using the Accused Products in their intended manner to infringe, *e.g.*, by using the VIZIO Accused Products to stream video, thereby making and/or using an infringing apparatus. VIZIO knowingly induces such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. Upon information and belief, VIZIO specifically intends that its actions will result in infringement of the 808 Patent, or at the very least, because VIZIO has been and remains on notice of the 808 Patent and the accused infringement, it has been and remains willfully blind regarding the infringement it has induced and continues to induce.

133.   VIZIO's acts of infringement have caused and continue to cause damage to Plaintiff and Plaintiff is entitled to recover from VIZIO damages sustained as a result of VIZIO's infringement of the Asserted Patents, but in no event less than a reasonable royalty.

## XI.   PRAYER FOR RELIEF

WHEREFORE, DivX respectfully prays for relief from this Court as follows:

A.   A judgment that VIZIO has infringed and continues to infringe one or more claims of the Asserted Patents;

B.   A judgment that VIZIO has induced infringement and continues to induce infringement of one or more claims of the Asserted Patents;

C.   A permanent injunction against VIZIO and its officers, employees, agents, attorneys, instrumentalities, and/or those in privity with them, from infringing one or more claims of the Asserted Patents or inducing the infringement of one of more claims of the Asserted Patents, and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

D.   A judgment awarding DivX all damages adequate to compensate DivX for VIZIO's infringement, and in no event less than a reasonable royalty for

COMPLAINT

VIZIO's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate allowed by law;

E.  A judgment that VIZIO has willfully infringed one or more claims of the Asserted Patents;

F.  A judgment awarding treble patent damages, pursuant to 35 U.S.C. § 284, as a result of VIZIO's willful infringement of one or more claims of the Asserted Patents;

G.  A finding that the case is an exceptional case, pursuant to 35 U.S.C. § 285, and that VIZIO be required to pay DivX's attorneys' fees and costs;

H.  A judgment awarding DivX such other relief as the Court may deem just and equitable.

## XII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, DivX hereby demands a jury trial on all issues so triable in this Action.

Date: October 24, 2022                Respectfully Submitted,

/s/ *Matthew D. Powers*
Matthew D. Powers (CA Bar No. 104795)
Paul T. Ehrlich (CA Bar No. 228543)
William P. Nelson (CA Bar No. 196091)
Natasha M. Saputo (CA Bar No. 291151)
Jerome Ma (CA Bar No. 335129)
TENSEGRITY LAW GROUP LLP
555 Twin Dolphin Drive
Suite 650
Redwood Shores, CA 94065
Tel: (650) 802-6000
Fax: (650) 802-6001
matthew.powers@tensegritylawgroup.com
paul.ehrlich@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
natasha.saputo@tensegritylawgroup.com

COMPLAINT

jerome.ma@tensegritylawgroup.com

Azra M. Hadzimehmedovic (CA Bar No. 239088)
TENSEGRITY LAW GROUP LLP
8260 Greensboro Dr.
Suite 260
McLean, VA 22102-3848
Tel: (650) 802-6000
Fax: (650) 802-6001
azra@tensegritylawgroup.com

*Attorneys for Plaintiff DivX, LLC*

COMPLAINT